UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF JOHN STENGLE, By its administrator, Karen Stengle and KAREN STENGLE and NICOLE STENGLE, | **3:20-CV-03001-RAL** |
| Plaintiffs, | **OPINION AND ORDER GRANTING PARTIAL SUMMARY JUDGMENT ON PUNITIVE DAMAGES CLAIM** |
| vs. | |
| THE WALGREEN COMPANY d/b/a WALGREENS, | |
| Defendant. | |

The estate of John Stengle (Mr. Stengle), his wife Karen Stengle, and his daughter Nicole Stengle (collectively referred to as "the Stengles") filed this action against the Walgreen Company d/b/a Walgreens ("Walgreens") seeking compensatory and punitive damages for Mr. Stengle's death. Doc. 1-Ex. A. Walgreens's pharmacists had blundered when they filled and re-filled Mr. Stengle's prescription for Amiodarone, an antiarrhythmic drug with a risk of liver toxicity. Doc. 1-Ex. A; Doc 25; Doc. 29. Mr. Stengle died at age 71 on February 1, 2019, and an autopsy found the likely cause of his death to be multisystem organ failure with "features suggestive of Amiodarone hepatoxicity." Doc. 1-Ex. A; Doc. 30 at 185, 233–34, 282. Walgreens filed a motion for partial summary judgment on the Stengles' punitive damages claim and a memorandum in support thereof. Docs. 21, 22. The Stengles have responded in opposition, and Walgreens has replied. Docs. 28, 33. For the reasons stated herein, this Court now grants Walgreen's motion for partial summary judgment on the punitive damages claim.

## I.      Facts

Mr. Stengle suffered from chronic ischemic heart disease including atrial fribulation. Doc. 25 at ¶ 1; Doc. 29 at ¶ 1. Mr. Stengle's Sioux Falls cardiologist prescribed a course of Amiodarone in February of 2018. Doc. 25 at ¶ 1; Doc. 29 at ¶ 1. Amiodarone is an antiarrhythmic drug metabolized in the liver, and excessive doses of Amiodarone can cause liver damage, which in turn can lead to multisystem organ failure and death. Doc. 31 at ¶ 5. The cardiologist wrote Mr. Stengle's prescription as follows:

> Amiodarone 200 Mg Tablet
> 1 TAB PO UD For Heart Rhythm 400mg 2x/day x 1week, then 200mg 3x/day x 2wks, then 200mg 2x/day x 2wks, then 200mg daily.

Doc. 25 at ¶ 2; Doc. 29 at ¶ 2. The cardiologist wrote the prescription for no more than 200 tablets,[1] but allowed for multiple refills.

Mr. Stengle lived in Pierre and went to his local Walgreens on February 28, 2018, to obtain the Amiodarone tablets. Walgreens's pharmacy in Pierre received the full prescription as written above. Doc. 25 at ¶ 3; Doc. 29 at ¶ 3. Walgreens's pharmacist who initially filled the prescription, David Lower, omitted the last line when filling the prescription and labeling the pill bottle. Doc. 25 at ¶ 3; Doc. 29 at ¶ 3. The Walgreens pill bottle received by Mr. Stengle read as follows:

> Amiodarone 200 mg tablets
> Take 2 tables [sic] by mouth twice daily for 1 week - [800 mg]
> Then 1 tablets [sic] by mouth three times daily for two weeks – [600 mg]
> Then 1 tablet by mouth twice daily for 2 weeks – [400 mg]

---

[1] The cardiologist's Amiodarone prescription would have Stengle take four 200 milligram (mg) tablets per day for seven days (28 tablets), three 200 mg tablets per day for 14 days (42 tablets), two 200 mg tablets per day for 14 days (28 tablets) and then one 200 mg tablet per day thereafter. The 200-pill quantity prescribed would last Mr. Stengle for the five initial weeks (98 pills total) and then an additional 102 days, covering a total time period of 19½ weeks or through roughly the end of June.

2

Doc. 25 at ¶ 4; Doc. 29 at ¶ 4. Walgreens's pharmacist omitted the portion of the instructions that read, "then 200mg daily." Pharmacist Lower has since admitted his error, testified that the omission was a "mistake," and apologized for the "accidental oversight." Doc. 23 at ¶¶ 2–3; Doc. 25 at ¶¶ 5–7; Doc. 29 at ¶¶ 5–7.

At the time Pharmacist Lower initially filled Mr. Stengle's prescription, the Walgreens's pharmacy in Pierre did not have enough pills to meet the entire 200 pill initial prescription. Doc. 25 at ¶ 9; Doc. 29 at ¶ 9. As a result, Pharmacist Lower partially filled Mr. Stengle's prescription with only 60 pills. Doc. 25 at ¶ 10; Doc. 29 at ¶ 10. Walgreens's pharmacist Whitney Flottmeyer completed filling Mr. Stengle's original prescription on March 12, 2018, by dispensing 454 Amiodarone pills. Doc. 25 at ¶ 11; Doc. 29 at ¶ 11. The manner in which Pharmacist Lower had entered the prescription called for 514 tablets, so Pharmacist Flottmeyer dispensed the difference between 514 tablets and the 60 tablets initially distributed.[2] Pharmacist Flottmeyer did not catch the instruction error omitting that Stengle was to be taking just one 200 mg tablet per day after the first five weeks of starting Amiodarone. Doc. 25 at ¶ 12; Doc. 29 at ¶ 12.

Mr. Stengle may have been taking three 200 mg tablets daily, if his report to a physician on November 19, 2018, was accurate. Doc. 30 at 182. Mr. Stengle sought to refill his Amiodarone prescription on August 23, 2018, suggesting that within about six months of the initial prescription, Mr. Stengle had come close to taking all 514 of the 200mg Amiodarone tablets dispensed by Walgreens in February and March of 2018.

---

[2] If Walgreens had entered the correct instructions on the pill bottle and Mr. Stengle had followed them, this 514-tablet quantity would have lasted through the spring of 2019; that is under the prescription as written, Mr. Stengle would have had more than a year's supply having received 514 tablets.

On August 23, 2018, Walgreens's pharmacist Nicole Metzinger refilled in part Mr. Stengle's Amiodarone prescription by dispensing ten pills, and then on September 5, 2018,[3] dispensed another 504 Amiodarone tablets to Mr. Stengle. Doc. 25 at ¶ 13; Doc. 29 at ¶ 13. Pharmacist Metzinger did not catch the initial error and duplicated it on the pill bottle instructions. Doc. 25 at ¶¶ 13, 15; Doc. 29 at ¶¶ 13, 15. The number of pills and timing of the refill evidently raised no red flags with Walgreens either. When Walgreens later transferred the prescription to another pharmacy, it again repeated the same initial error.

Mr. Stengle's health deteriorated in late 2018, and he suffered mightily in the weeks before his death. Doc. 25 at ¶ 19; Doc. 29 at ¶ 19. The Stengles and their experts attribute Mr. Stengle's suffering and death to Amiodarone-induced hepatoxicity, a known side effect of overingestion of Amiodarone. Doc. 30 at 175–324; Doc. 31 at ¶ 6. Walgreens's pharmacists were all aware of Amiodarone being a "black box" drug with hepatoxicity as a risk from overconsumption. Doc. 31 at ¶¶ 1–3. There is no evidence that Walgreens or its pharmacists sought to cover up or conceal the error once aware of it. Walgreens does not contest liability, but contests causation and damages alleged. As a part of this action, the Stengles seek punitive damages for the death of Mr. Stengle. Doc. 1-Ex. A at ¶ 34; Doc. 25 at ¶ 22; Doc. 29 at ¶ 22. Walgreens contends that the Stengles are not entitled to punitive damages as a matter of law and have filed a motion for partial summary judgment on that issue. Doc. 21.

## II.     Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[3] There is some suggestion in the record that September 8, 2018, may have been a date when Mr. Stengle received the completed refill of Amiodarone.

4

South Dakota law governs the substantive issues in this case based on diversity of citizenship jurisdiction. Bores v. Domino's Pizza, LLC, 530 F.3d 671, 674 (8th Cir. 2008) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Under South Dakota law, punitive damages are not recoverable unless expressly authorized by statute. SDCL § 21-1-4. The statute that authorizes punitive damages in tort actions is SDCL § 21-3-2, which provides as follows:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

While SDCL § 21-3-2 limits its applicability to tort cases involving "oppression, fraud, or malice," the Supreme Court of South Dakota has stated that "[m]alice is an essential element of a claim for punitive damages." Smizer v. Drey, 873 N.W.2d 697, 703 (S.D. 2016) (citation omitted); Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991).

South Dakota law erects a procedural hurdle in SDCL § 21-1-4.1 before a claim for punitive damages can be presented to the jury.[4] Although this Court is not bound by those procedural requirements of state law, this Court nonetheless must apply the stringent requirements of South Dakota statutory and case law on punitive damages in this diversity of citizenship case where South Dakota law governs. Ammann v. Massey-Ferguson, Ltd., 933 F. Supp. 840, 843 (D.S.D. 1996). Thus, this Court has previously required that for a punitive damages claim to survive on a motion for summary judgment, the plaintiff must satisfy the standard in SDCL § 21-1-4.1 by

---

[4] SDCL § 21-1-4.1 states:

In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.

showing by clear and convincing evidence that a reasonable basis exists upon which a jury could find the existence of malice. Straub v. Flevares, 4:13-CV-04120-KES, 2016 WL 1452363, at *2 (D.S.D. Apr. 13, 2016); Schrant v. Flevares, No. 4:12–CV–04180–KES, 2014 WL 7240090, at *2 (D.S.D. Dec. 19, 2014);  Winterboer v. Edgewood Sioux Falls Senior Living, LLC, No. CIV. 12–4049–KES, 2014 WL 28863, at *2 (D.S.D. Jan. 2, 2014).

Malice can be actual or presumed. Smizer, 873 N.W.2d at 703 (citation omitted). Actual malice under South Dakota law is "a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will toward that person." Dahl, 474 N.W.2d at 900. The Stengles do not contend that Walgreens or its pharmacists had any such actual malice.

Presumed malice, on the other hand, does not require the individual to act out of hatred or ill-will, but requires that an individual acts "willfully or wantonly to the injury of another." Id. The Supreme Court of South Dakota has clarified, however, that malice is not presumed from "simply the doing of an unlawful or injurious act." Id. (citation omitted).   Rather, malice is presumed from acts that are "conceived in the spirit of mischief or of criminal indifference to civil obligations." Id. (citation omitted). "There must be facts that would show that defendant intentionally did something . . . [and] it can be said that he consciously realized that his conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to the plaintiff." Berry v. Risdall, 576 N.W.2d 1, 9 (S.D. 1998); Flockhart v. Wyant, 467 N.W.2d 473, 478 (S.D. 1991). Further, presumed malice is "conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong." Berry, 576 N.W.2d at 9; Flockhart, 467 N.W.2d at 478. In other words, "[t]he conduct must be more than mere mistake, inadvertence, or inattention." Gabriel v. Bauman, 847

N.W.2d 537, 543 (S.D. 2014); see also Vilhauer v. Horsemens' Sports, Inc., 598 N.W.2d 525, 529 (S.D. 1999) (emphasizing that punitive damages cannot be recovered for mere negligence).

The Stengles argue that Walgreens's actions involved presumed malice, asserting that Walgreens's conduct constitutes gross negligence which is the equivalent of willful or wanton misconduct. To support this contention, the Stengles cite to Jayne v. City of Sioux Falls, 4:18-CV-04088-KES, 2020 WL 2992164 (D.S.D. June 4, 2020), and Fischer v. City of Sioux Falls, 919 N.W.2d 211 (S.D. 2018). Both of these cases equate the phrases "gross negligence" and "willful or wanton misconduct" with one another. Jayne, 2020 WL 2992164, at *2; Fischer, 919 N.W.2d at 215. Neither Jayne nor Fischer involved discussion of a punitive damages claim; both cases involved municipal statutory immunity under SDCL §§ 20-9-20 and 20-9-22 by which a municipality is immune from negligence claims in connection with public lands open to recreational use unless the injury resulted from willful or wanton misconduct. In cases involving claims of punitive damages, no South Dakota court has equated gross negligence to presumed malice, although an older federal district court case, citing solely to a treatise, states that something more than gross negligence is required for punitive damages in South Dakota. See Bierle v. Liberty Mut. Ins. Co., 792 F. Supp. 687, 691 (D.S.D. 1992).

Ultimately, this Court does not need to determine if the discussion in Fischer and Jayne about gross negligence was meant to apply to the presumed malice requirement for punitive damages in South Dakota, because the conduct of Walgreens and its pharmacists do not meet the "culpable mental state" component discussed in Fischer and Jayne. In Fischer, the Supreme Court of South Dakota stated that a plaintiff alleging gross negligence or willful and wanton misconduct must prove that the defendant knew or should have known of the substantial probability of serious physical harm and acted with a culpable mental state. 919 N.W.2d at 215–16. In short, the

8

defendant must have assessed the risk and chosen to proceed without concern for the safety of others. Id. at 215. Quoting Tranby v. Brodock, 348 N.W.2d 458, 461 (S.D. 1984), Fischer required gross negligence or willful or wanton misconduct to partake "to some appreciable extent . . . of the nature of a deliberate and intentional wrong." 919 N.W.2d at 215.

The main thrust of the Stengles' argument is that the three pharmacists involved in this case acted grossly negligently and to some extent in the nature of a deliberate and intentional wrong because they were aware that incorrectly filling a prescription of Amiodarone could cause dire consequences and did in fact incorrectly fill and refill Mr. Stengle's Amiodarone prescription. All three pharmacists testified that they were aware of the risk of liver toxicity associated with incorrectly filling a prescription for Amiodarone. But awareness of the risk in and of itself does not constitute presumed malice or willful or wanton misconduct. To be presumed malice, or for that matter "gross negligence" under Fischer, the pharmacists would need to be aware of the risk and to some appreciable extent deliberately or intentionally fill Mr. Stengle's prescription incorrectly in disregard of that risk. See Berry, 576 N.W.2d at 9 (noting that the tortfeasor must intentionally do something in conscious disregard of the probable harm his action would bring to the plaintiff); Fischer, 919 N.W.2d at 215 (requiring conduct that contemplates to some appreciable extent of the nature of a deliberate and intentional wrong); see also Dahl, 474 N.W.2d at 900 (noting that the term "intentional" is synonymous with "willful"). That is not what happened here. The evidence is undisputed that the pharmacists negligently, but not intentionally, erred in filling Mr. Stengle's prescription. In other words, their conduct was "mere mistake, inadvertence, or inattention." Gabriel, 847 N.W.2d at 543. Even under the Fischer case equating "gross negligence" with "willful and wanton misconduct" in the context of municipal liability, the undisputed material facts here do not establish a "culpable mental state." 919 N.W.2d at 215–16.

None of Walgreens's pharmacists—regardless of how irresponsibly neglectful they were or the seemingly dire consequences resulting—had the requisite "culpable mental state" by acting in some appreciable nature deliberately or intentionally or in a manner "conceived in the spirit of mischief or of criminal indifference to civil obligations." Dahl, 474 N.W.2d at 900.

Indeed, if this Court adopted the Stengles' logic, many healthcare professionals whose decisions involve a risk of harm to others could face punitive damages for merely negligent conduct. Most healthcare professionals have a general awareness of the dire consequences that could result from making a mistake on the job. According to the Stengles' argument, that general awareness coupled with a tragic mistake equates to gross negligence, willful and wanton misconduct, and in turn presumed malice. The South Dakota Legislature did not intend for punitive damages to accompany typical malpractice cases. Viewing the facts in the light most favorable to the Stengles, this Court finds that the undisputed material facts establish no reasonable basis for a jury to presume malice on the part of Walgreens or its pharmacists. Walgreens is entitled to partial summary judgment on the punitive damages claim.

**IV.    Conclusion**

For the foregoing reasons, it is hereby

ORDERED that the Defendant's motion for partial summary judgment on the punitive damages claim, Doc. 21, is granted.

DATED this _8th_ day of March, 2021.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

10